Edward C. Hopkins Jr., Bar No. 028825
Alexandra Tracy-Ramirez, Bar No. 028570
**HOPKINSWAY PLLC**
2575 E. Camelback Rd., Ste. 450
Phoenix, Arizona 85016
(602) 714-7172 tel
ehopkins@hopkinsway.com,
atracyramirez@hopkinsway.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer Zonis and Todd Zonis,<br><br>   Plaintiffs,<br><br>vs.<br><br>Steven Allen,<br><br>   Defendant. | No._____<br><br><br>VERIFIED COMPLAINT |

For their complaint against the Defendant Steven Allen, the Plaintiffs, Jennifer Zonis and Todd Zonis ("the Zonises"), state and allege:

**I.   Parties, Jurisdiction, and Venue**

1. Mr. Allen is a Washington resident.
2. Mr. and Mrs. Zonis, husband and wife, are Arizona residents.
3. The Zonises bring Arizona tort claims against Mr. Allen for:
   i.   violating A.R.S. § 13-3004;
   ii.  defamation;
   iii. false light invasion of privacy;
   iv.  public disclosure of private facts;
   v.   intrusion upon seclusion; and
   vi.  intentional infliction of emotional distress.
4. These claims arise from Mr. Allen's contacts with and actions directed at Arizona.

5. Mr. Allen directed activities toward Arizona and created contacts with Arizona by the following acts:

    i. forming a contract with an Arizona business;

    ii. using the products and services of businesses that operate in Arizona to reach Arizona residents;

    iii. sending electronic messages about the Zonises to many third party Arizona residents;

    iv. sending electronic messages about the Zonises to Mr. Zonis's relatives and Mrs. Zonis's in-laws living in Arizona;

    v. sending electronic messages containing extortive threats to the Zonises in violation of 18 U.S.C. § 875(d);

    vi. sending the Zonises electronic messages containing directly obscene, lewd, and profane language for the purposes of terrifying, intimidating, threatening, and harassing them in violation of A.R.S. § 13-2916(A)(1);

    vii. sending the Zonises electronic messages containing repeated, unwanted, and unsolicited communications that disturbed the Zonises' peace, quiet, and right of privacy in Arizona for the purposes of terrifying, intimidating, threatening, and harassing them in violation of A.R.S. § 13-2916(A)(3);

    viii. contacting the Zonises by electronic or written means in a manner that harassed them in violation of A.R.S. § 13-2921(A)(1);

    ix. repeatedly sending harassing electronic messages to the Zonises in violation of A.R.S. § 13-2921(A)(3);

    x. intentionally or knowingly engaging in a course of conduct directed at the Zonises that would cause reasonable people to fear for their safety or the safety of their immediate family members and that caused the Zonises to fear for their safety or the safety of their immediate family members in violation of A.R.S. § 13-2923(A)(1);

|   |   |   |   |
|---|---|---|---|
| | | xi. | knowingly sending to the Zonises writings threatening to publish their failings or infirmities or to impute their dishonesty in violation of A.R.S. § 13-3004; |
| | | xii. | intentionally causing the Zonises to suffer actual, noneconomic damages in Arizona, including but not limited to, damage to their reputation, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, fear, anger, humiliation, and impairment of quality of life of a total value exceeding $75,000.00. |

6. Arizona Revised Statutes § 13-2916(b) states "[a]ny offense committed by use of an electronic communication as set forth in this section is deemed to have been committed at either the place where the communications originated or at the place where the communications were received."
7. This Court has original jurisdiction over this civil action under 28 U.S.C. § 1332(a)(1).
8. This Court has personal jurisdiction over Mr. Allen under Ariz. R. Civ. P. 4.2(a).
9. Venue is proper in the Court under 28 U.S.C. §§ 1391(b)(2) and (c)(1).

**II.  General Allegations**

10. *Black's Law Dictionary*, 62 (10th ed. 2014) defines 'adultery' as "[v]oluntary sexual intercourse between a married person and someone other than the person's spouse."
11. Mr. Zonis and Mrs. Allen have never committed adultery with each other.
12. Mr. Zonis and Mrs. Allen have never had sexual intercourse with each other.
13. Mr. Zonis and Mrs. Allen have never touched each other.
14. Mr. Zonis and Mrs. Allen have never been in the same room with each other.
15. The Zonises and Mr. Allen's wife (Mrs. Allen) used to be good friends.
16. The Zonises were never friends with Mr. Allen.
17. The Zonises never authorized Mr. Allen to send them email messages.

18. The Zonises never authorized Mr. Allen to send them text messages via phone.
19. Mr. Zonis and Mrs. Allen met one another online via the Internet and became friends more than one year before September 2013.
20. Mrs. Zonis became aware that Mr. Zonis and Mrs. Allen were friends shortly after the friendship began.
21. Mrs. Zonis became a friend to Mrs. Allen shortly after Mr. Zonis did.
22. Mrs. Allen admired the Zonises' relationship.
23. Mrs. Allen frequently sought martial advice from the Zonises.
24. Mrs. Allen voluntarily shared detailed information with the Zonises about the ways Mr. Allen mistreated and abused her and asked the Zonises to help her figure out how to improve her relationship with Mr. Allen.
25. The detailed information Mrs. Allen shared with the Zonises Zonises about the ways Mr. Allen mistreated and abused her caused the Zonises to worry about Mrs. Allen's mental and physical welfare.
26. Late September 2013, Mr. Allen, without having obtained permission from either of them, read private messages Mrs. Allen and Mr. Zonis had exchanged.
27. On September 30, 2013, Mrs. Allen sent Mr. Zonis an email informing him that:

> Steve found the emails. I did not LET him look. He claims it popped up, but i was always careful to log out of the programs I shared with you so that he would not find them. I must have closed it or minimized gmail, and thought i had logged out. That night he asked about my relationship with you. I lied. His questions were not too suspicious or demanding, but still made me wonder what he knew. I don't need to tell you I am a horrible liar. The next night, he came home , and sat me on the couch, with some paperwork in hand. He asked me point blank, what my feelings for you were, and if we were involved online. I knew he knew. I told him that you were special to me, and that there were some acts that we shared (I had no idea he had read my emails to you already, so I tried to hold back.) Then he told me about the email. He apologized profusely for reading them. And then, apologized for neglecting me the last several years. Then he handed me the paperwork. I thought it might be divorce papers or something, but it was a how to fix your marriage thing. And how being bluntly honest is the way after trust issue; have been brought about to heal a marriage. He

4

> told me he did not want a divorce, but blamed himself for what had happened to us, and for my developing feeling for you. Steve asked if I trusted him, to which I told him with blunt honesty "no". He had given me no reason to trust him in the last three years. Our discussion went on from there.

28. When Mr. Allen discovered Mrs. Allen's friendship with Mr. Zonis, Mr. Allen began obtaining information from the Marriage Builders website (www.marriagebuilders.com) that he would later use to devise and execute a scheme to (a) isolate Mrs. Allen from the Zonises by publicly shaming her in Washington and (b) cause severe dignitary harm to the Zonises in Arizona.

29. Ignorant of Mr. Allen's long-term scheme, on October 2, 2013, Mrs. Allen sent Mr. Zonis an email stating: "Please feel free to message me ANYTIME! Evening, night, day, whenever!"

30. Between October 2, 2013, and November 22, 2014, Mrs. Allen sent Mr. Zonis hundreds of messages, most of which informed Mr. Zonis that she valued his friendship.

31. During that period, Mr. Allen surreptitiously accessed and read private messages Mrs. Allen and Mr. Zonis sent each other via phone and email knowing that neither authorized him to do so.

32. In November 2014, after months of careful planning, Mr. Allen began his attack against the Zonises.

33. **Communication 1** - On November 22, 2014, 6:02 p.m. Mr. Allen sent to Mrs. Zonis's private phone a series of unsolicited text messages that stated:

> My name is Steven Allen. If you are married to Todd Zonis, then I want to inform you that your husband is having an internet affair with my [Mrs. Allen]. This started in August 2013, but ended Sept. 26th. Restarted in March 2014 (best that I can tell). It is ongoing to this point. I have heard from [Mrs. Allen] that you and Todd have an open marriage. [Mrs. Allen] and I do not have that understanding. Furthermore, from what I know about open marriages and swingers, emotional attachment is discouraged. They definitely have a two way strong emotional attachment. Even if you don't care about that, this affair is ruining my marriage and risking the

5

> future family security of my 4 year old son. As someone who I have heard wanted children, please consider this. I have text messages for the recent weeks and emails for all the affair. If you would like the detailed evidence or have questions, please em.

34. On November 22, 2014, at 7:20 p.m. Mrs. Zonis sent Mr. Allen the following response to Communication 1:

> First of all I don't know who you are but it is incredibly rude of you to have sent this to me. And my relationship with my husband is none of your business. I mean how dare you think you know us? What kind of person sends a text like that anyways? And online affair? Grow up. If you are this mean spirited are spying and sending hurtful messages to someone you don't even know, maybe that is the problem. Please don't text me again as I have nothing to say to you.

35. **Communication 2** - On November 22, 2014, before 10:34 p.m., Mr. Allen sent Mr. Zonis's parents an unsolicited email containing the following text:

> If you have a son, Todd Zonis, I wish to inform you that he is having an internet affair with my wife [Mrs. Allen]. This involves texts, emails cell calls, internet video calls and shared recorded videos of masturbation. You're son made a cast of his penis as a sex toy and sent it to my wife. This is ruining my marriage and risking our family (my wife, me, and our son). I have heard that your son and his wife, Jennifer has and open relationship, but those usually strongly discourage emotional attachment. This affair, initially started August 2013, initial discovery Sept 25, 2013 and restarted in March 2014 (I think could have been earlier) and ongoing today. You obviously have children and value your marriage. I would ask that you encouraged your son to stop this affair before it completely ruins our family. If you have any questions or would like to see some of the evidence, please email me. Thank You, Sincerely, Steven Allen.

36. Before Mr. Allen sent Communication 2, Mr. Zonis and his parents saw one another regularly and had a healthy, loving relationship.

37. As a direct result of Communication 2, Mr. Zonis's parents and Mrs. Zonis's in-laws stopped communicating with them and stopped inviting them to family events.

6

38. Mr. Zonis's parents also sold a valuable piece of Arizona real estate they had planned to leave to Mr. Zonis in their will before they received Communication 2.
39. Mr. Zonis would not have lost the future benefits of inheriting and owning the Arizona real estate his parents had planned to leave him but for Mr. Allen's sending Communication 2 to Mr. Zonis's parents in Arizona.
40. **Facebook Communications** - During November 2014, Mr. Allen began sending messages to many www.facebook.com users that falsely alleged the Zonises:
    i. engaged in unchaste behavior;
    ii. had an unchaste character;
    iii. engaged in dishonest conduct;
    iv. had a dishonest character;
    v. engaged in sexual misconduct;
    vi. mentally abused Mrs. Allen;
    vii. committed adultery with Mrs. Allen;
    viii. intentionally harmed Mr. Allen's son;
    ix. harassed Mrs. Allen; and
    x. engaged in conduct that violated Arizona's criminal statutes.
41. Mr. Allen omitted and withheld from his Facebook Communications relevant information about the ways he had mistreated and abused Mrs. Allen to deceive readers about the reasons why Mrs. Allen voluntarily sought out and maintained friendships with the Zonises.
42. Mr. Allen intentionally made many contacts with third parties by sending the Facebook Communications to cause the Zonises to suffer actual, noneconomic damages, including but not limited to, damage to their reputation, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, anger, humiliation, and impairment of quality of life in Arizona.
43. Mrs. Allen informed the Zonises about the Facebook Communications.

44. The Zonises did not have copies of the Facebook Communications on the date this action was filed.
45. The Zonises will obtain copies of the Facebook Communications after discovery begins for this civil action.
46. The company that owns and operates www.facebook.com, Facebook, Inc., is headquartered in California but does business in Arizona.
47. Mr. Allen violated Facebook, Inc.'s terms of service, available at https://www.facebook.com/legal/terms, when he sent the Facebook Communications to Facebook, Inc.'s customers.
48. **Marriage Builders Communications** - Less than one year before this action commenced, Mr. Allen sent messages to many www.marriagebuilders.com users and made statements that falsely alleged the Zonises
    i. engaged in unchaste behavior;
    ii. had an unchaste character;
    iii. engaged in dishonest conduct;
    iv. had a dishonest character;
    v. engaged in sexual misconduct;
    vi. mentally abused Mrs. Allen;
    vii. committed adultery with Mrs. Allen;
    viii. intentionally harmed Mr. Allen's son;
    ix. harassed Mrs. Allen; and
    x. engaged in conduct that violated Arizona's criminal statutes.
49. Mr. Allen omitted and withheld relevant information about the ways he had mistreated and abused Mrs. Allen from his Marriage Builders Communications to deceive readers about the reasons why Mrs. Allen voluntarily sought out and maintained friendships with the Zonises.
50. Some of the people to whom Mr. Allen sent the Marriage Builders Communications lived in Arizona.

51. Mr. Allen knew or believed some of the people to whom he sent the Marriage Builders Communications lived in Arizona.
52. Mr. Allen intentionally made these contacts with third party Arizona residents by sending the Marriage Builders Communications to cause the Zonises to suffer actual, noneconomic damages in Arizona, including but not limited to, damage to their reputation, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, anger, humiliation, and impairment of quality of life.
53. The Zonises did not have copies of the Marriage Builders Communications on the date this action was filed.
54. The Zonises will obtain copies of the Marriage Builders Communications after discovery begins for this civil action.
55. The company that owns and operates www.marriagebuilders.com, Marriage Builders, Inc., is headquartered in Minnesota but does business in Arizona.
56. Mr. Allen used services Marriage Builders, Inc. provided to its Arizona customers to publish harmful statements about the Zonises to third party Arizona residents.
57. **Communication 3** - On February 24, 2015, at 11:18 p.m. Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

> I told you that someone like you would lose to me. I know [Mrs. Allen] better than you think. You are the sort of person that I can roll right over if you try anything. I have been laughing at the constant attempts to get [Mrs. Allen] to listen to you. You are a loser and actions have consequences, for you at least. Hope your wife continues to hate being married to the most despicable person I have ever encountered.

58. **Communication 4** - On February 26, 2015, at 1:06 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

> I heard you whined like a bitch today. The amount this is costing me is well worth it to watch you squirm. Too bad your whore wife is still without a child. That must be a great thing to discus over dinner. Did I mention that I own [Mrs. Allen] again? And it is you that is gone. It was so easy you

>would not believe it. I understand it caused you some hurt. Well how do you think I felt seeing the things my wife loved doing for you and never did for me? Screw you, and I am going to continue to hurt you because you still have not figured out that [Mrs. Allen] does whatever I tell her to, not the other way around. Until next time.

59. **Communication 5** - On February 28, 2015, at 5:59 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

>I heard that [Mrs. Allen] still wont listen to you. When will you go away. If you haven't figured it out yet, she has always been a bit curious but in the end, she does as i tell her. You sounded so sure when you told me that I would be the one who was going somewhere. I don't know how you could have thought to yourself that she would ever do anything other than some talking behind my back. You lost. Deal with it.

60. **Communication 6** - On March 9, 2015, at 10:04 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text: "Do you not get it yet? I have won. [Mrs. Allen] did "fall for it" as you said. Now fuck off, and deal with it!"

61. **Communication 7** - On March 22, 2015, at 3:42 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

>You have annoyed me for the last time. I told you [Mrs. Allen] we never believe you. [Mrs. Allen] is doing my marriage plan, not Marriage Builders. I took the best parts of that and added in my own penalties, and all i had to do was act like the benevolent husband, and let you do all the work. Since you have seen the thread on [www.marriagebuilders.com] site, you should know how entrenched I am, and how fast I made [Mrs. Allen] hate you and trust me, like [Mrs. Allen] never did before. Soon you won't be able to send any cries of innocence to us anymore, and I plan on continuing to cause you pain like you can't even imagine. Your poor childless wife crying, hating you almost as much as I do. We hate you. Your own wife will hate you. Sounds exactly the way it should be. See you in court.

62. **Communication 8** - On March 23, 2015, at 6:02 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

> Not showing up for this one either? You pathetic loser. You and your barren wife deserve everything [Mrs. Allen] is going to give you at that hearing. I told you she would do what I told her to do. She even thinks it was her idea. You are a despicable person and I love to watch you suffer.

63. **Communication 9** - On March 31, 2015, at 10:17 p.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text: "I couldn't help but notice that the day you were in court up here it was the sunniest and hottest day of the year! Time to focus on your wife now. I haven't forgotten about her, don't worry. Happy Easter"

64. **Communication 10** - On April 23, 2015, at 6:37 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text: "I haven't left you alone yet. Don't worry. More fun and games for you to come. Your wife can certainly expect my attention now. You will wish you had just died when I'm done. Say goodbye to your credit rating."

65. **Communication 11** - On May 25, 2015, at 10:46 p.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

> What you did was not very nice. It is not surprising with you. Just goes to show the type of person you are. You are not forgotten of. More fun is coming your way. [Mr. Zonis's Social Security Number]. Let's find out what fun we can have with that. The best part is that there is nothing you can do about it. You can't even shout at me if I don't let you. This will have me laughing all week.

66. **Communication 12** - On July 2, 2015, at 1:51 p.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text:

> Did you seriously think that I wasn't going to make you suffer in as many ways as possible? A brief check of your credit report told me that I would get your wife in one way or another. You need to learn that nobody cares that I made [Mrs. Allen] do exactly what I told [Mrs. Allen] to do. No one cares that I got exactly the outcome I knew I would the whole time. You are going to regret ever listening to [Mrs. Allen] and getting involved. [Mrs. Allen] was never going anywhere, and we all know that [Mrs. Allen] was going to do exactly

what I force [Mrs. Allen] to do, now, and in the future. You should think about that before you try any feeble attempt at trying to convince [Mrs. Allen] otherwise. [Mrs. Allen] will soon see what happens if you get in my way, in case [Mrs. Allen] will ever think about defying me again. Say hi to your wife for me.

67. **Communication 13** - On July 18, 2015, at 10:23 a.m., Mr. Allen sent Mr. Zonis an email without his consent containing the following text: "Hi. Still without a child? That's a shame. I told you you were a moron, and you proved it. You never had a chance."

### III. Count 1 - Violation of A.R.S. § 13-3004

68. The Zonises incorporate all previous allegations as if set forth in this count.

69. Arizona Revised Statutes § 13-3004 states:

> A person who knowingly sends or delivers to another a letter or writing, whether subscribed or not, threatening to accuse him or another of a crime, or to expose or publish his failings or infirmities, and a writer or sender of an anonymous letter or writing calculated to create distrust of another or tending to impute dishonesty, want of chastity, drunkenness or any crime or infirmity to the receiver of the letter or to any other person, is guilty of a class 2 misdemeanor.

70. Arizona Revised Statutes § 12-731 states:

> A. Except as provided in title 13, chapter 30, any person whose wire, oral or electronic communication is intentionally intercepted, disclosed or used in violation of title 13, chapter 30 may bring a civil action to recover from the person or entity that engaged in the violation the following:
>
> 1. Such preliminary and other equitable or declaratory relief as may be appropriate.
>
> 2. Damages in an amount that is the greater of either:
>
> (a) The sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation.
>
> (b) Statutory damages of one hundred dollars a day for each day of the violation.

    (c) Statutory damages of ten thousand dollars.

    3. Punitive damages in appropriate cases.

    4. Reasonable attorney fees and other reasonable costs of litigation.

  B. A civil action under this section may not be commenced later than one year after the date upon which the plaintiff first has a reasonable opportunity to discover the violation.

71. Arizona Revised Statutes § 13-3001(4) defines the term "electronic communication" as:

  any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature that is transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system but that does not include any of the following:

  (a) Any wire or oral communication.

  (b) Any communication made through a tone-only paging device.

  (c) Any communication from a tracking device.

72. After August 28, 2014, Mr. Allen used the Zonises' electronic communication to knowingly send or deliver to them writings threatening to expose or publish their failings or infirmities, to create distrust of them, and to impute their dishonesty and want of chastity.

73. As a direct result of Mr. Allen's conduct, the Zonises suffered actual, noneconomic damages in Arizona, including but not limited to, damage to their reputation, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, fear, humiliation, and impairment of quality of life in Arizona.

74. The Zonises also incurred statutory damages under A.R.S. § 12-731.

**IV. Count 2 - Defamation**

75. The Zonises incorporate all previous allegations as if set forth in this count.

76. The Zonises are private figures.

13

1 77. The Zonises' friendship with Mrs. Allen was never a matter of public concern.
2 78. When Mr. Allen published the communications described in this Complaint to third parties in Arizona, he published statements that brought the Zonises into disrepute, contempt, and ridicule, and impeached the Zonises's honesty, integrity, virtue, and reputation.
6 79. Each defamatory communication Mr. Allen published to a third party about Mr. Zonis was a defamatory publication giving rise to this civil action.
8 80. Each defamatory communication Mr. Allen published to a third party about Mrs. Zonis was a defamatory publication giving rise to this civil action.
10 81. Reasonable third parties residing in Arizona believed Mr. Allen's false and defamatory publications about the Zonises were true.
12 82. The reasonable third parties who believed Mr. Allen's false and defamatory publications about the Zonises were true held lower opinions of the Zonises as a direct result of reading Mr. Allen's publications.
15 83. Defamatory statements Mr. Allen published to third parties in Arizona about the Zonises were false, omissive, and misleading.
17 84. Mr. Allen knew defamatory statements he published to third parties in Arizona about the Zonises were false, omissive, and misleading when he published them.
19 85. Mr. Allen knew or reasonably expected the defamatory statements he published to third parties in Arizona about the Zonises to be repeated by those third parties in Arizona.
22 86. Third parties in Arizona received or read Mr. Allen's defamatory publications about the Zonises and repeated them in Arizona.
24 87. As a direct result of Mr. Allen's conduct, the Zonises suffered actual, noneconomic damages in Arizona, including but not limited to, damage to their reputation, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, anger, humiliation, and impairment of quality of life in Arizona.
28 88. But for Mr. Allen's publishing defamatory statements, the Zonises would not have

1 suffered the defamation damages they suffered in Arizona.

## V. Count 3 - False Light Invasion of Privacy

89. The Zonises incorporate all previous allegations as if set forth in this count.
90. When Mr. Allen published the communications described in this Complaint to third parties in Arizona, he published statements that gave publicity to a matter concerning the Zonises that placed them before the public in a false light.
91. The false light in which Mr. Allen's publications placed the Zonises was highly offensive to reasonable people who reside in Arizona.
92. Mr. Allen knew his communications were omissive, deceptive, and misleading and would lead readers to form false impressions of the Zonises.
93. Mr. Allen knew the communications he published contained false implications and innuendo about the Zonises that would place them in a false light in Arizona.
94. The communications Mr. Allen published about the Zonises were major misrepresentations of the Zonises's character, history, activities, and beliefs.
95. Mr. Allen published his communications about the Zonises to a large group of people, many of whom resided in Arizona.
96. As a direct result of Mr. Allen's conduct, the Zonises suffered actual, noneconomic damages in Arizona, including but not limited to, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, anger, humiliation, and impairment of quality of life in Arizona.
97. But for Mr. Allen's publishing the false light statements, the Zonises would not have suffered the false light damages they suffered in Arizona.

## VI. Count 4 - Public Disclosure of Private Facts

98. The Zonises incorporate all previous allegations as if set forth in this count.
99. When Mr. Allen published the communications described in this Complaint to third parties in Arizona, he published statements that gave publicity to matters

1     concerning the Zonises' private lives.

100. None of the communications about the Zonises' private lives that Mr. Allen published to third parties was a matter of public concern.

101. Mr. Allen's publications about the Zonises' private lives were embarrassing and highly offensive to reasonable people who reside in Arizona.

102. As a direct result of Mr. Allen's conduct, the Zonises suffered actual, noneconomic damages in Arizona, including but not limited to, mental pain and suffering, inconvenience, emotional stress, anxiety, embarrassment, anger, humiliation, and impairment of quality of life in Arizona.

103. But for Mr. Allen's publishing statements about the Zonises's private lives, the Zonises would not have suffered the public disclosure of embarrassing private facts damages they suffered in Arizona.

## VII. Count 5 - Intrusion upon Seclusion

104. The Zonises incorporate all previous allegations as if set forth in this count.

105. When Mr. Allen published the communications described in this Complaint to the Zonises without obtaining their permission to contact them via email or phone, he published statements that intentionally intruded upon their solitude, their seclusion, and their private affairs or concerns in Arizona.

106. Mr. Allen's unsolicited communications to the Zonises were highly offensive to reasonable people who reside in Arizona.

107. The Zonises did not expect that Mr. Allen would contact them through their private email addresses or private phone numbers without their permission because they never gave him permission to do so.

108. Mr. Allen's aggressive and repeated intrusions caused the Zonises to fear Mr. Allen would attempt to harm them physically in Arizona.

109. As a direct result of Mr. Allen's conduct, the Zonises suffered actual, noneconomic damages in Arizona, including but not limited to, mental pain and

|   |   |   |
|---|---|---|
| 1 |  | suffering, inconvenience, fear, emotional stress, anxiety, anger, and impairment of |
| 2 |  | quality of life in Arizona. |
| 3 | 110. | But for Mr. Allen's send unsolicited communications, the Zonises would not have |
| 4 |  | suffered the intrusion upon seclusion damages they suffered in Arizona. |

### VIII. Count 6 - Intentional Infliction of Emotional Distress

111. The Zonises incorporate all previous allegations as if set forth in this count.
112. By engaging in the conduct alleged above, Mr. Allen intended to humiliate, intimidate, harass, embarrass, enrage, and terrify the Zonises.
113. The totality of Mr. Allen's conduct was extreme and outrageous.
114. Reasonable people would consider the totality of Mr. Allen's conduct atrocious and utterly unacceptable in a civilized community.
115. Mr. Allen did not need to make contact with the Zonises or third parties in Arizona to improve the quality of his relationship with Mrs. Allen in Washington.
116. Mr. Allen only needed to humble himself and seek the expert advice of a professional counselor so he could learn how to treat his wife with the dignity, care, and love she was craving before she befriended the Zonises.
117. As a direct result of Mr. Allen's extreme and outrageous conduct, the Zonises suffered actual, noneconomic damages in Arizona, including but not limited to, mental pain and suffering, inconvenience, fear, emotional stress, anxiety, anger, and impairment of quality of life in Arizona.
118. But for Mr. Allen's intentional infliction of severe emotional distress on the Zonises in Arizona, the Zonises would not have suffered the intentional infliction of emotional distress damages they suffered in Arizona.

### IX. Prayer for Relief

WHEREFORE, the Zonises pray for judgment in their favor against Mr. Allen:

119. for declaratory judgment finding Mr. Allen published statements about Mr. Zonis

that were defamatory;

120. for declaratory judgment finding Mr. Allen published statements about the Zonises portrayed them in a false light;
121. for declaratory judgment finding the Mr. Allen published statements about the Zonises that publicly disclosed embarrassing facts about their private lives;
122. for the Zonises' taxable costs under A.R.S. § 12-341;
123. for interest on the Zonises' taxable costs at the maximum legal rate from the date judgment is entered until the date the judgment is paid in full;
124. for attorneys' fees under A.R.S. § 12-731(A);
125. for punitive damages;
126. and for any other relief the Court deems just and proper.

## X. Jury Trial Demanded

The Zonises demand a jury trial on all triable claims.

DATED this 28th day of August 2015.

HOPKINSWAY PLLC

*/s/ Edward C. Hopkins Jr.*
Edward C. Hopkins Jr.
Alexandra Tracy-Ramirez

*Attorneys for Plaintiffs*

# VERTIFICATION

We, Jennifer Zonis and Todd Zonis, are the plaintiffs in this case. We hereby certify under penalty of perjury that we have reviewed the foregoing complaint, know its contents, and know or have reasonable grounds believe all of its allegations are true.

_____   8/28/15
Jennifer Zonis                              Date

_____   8/28/15
Todd Zonis                                   Date